**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

KRISTEN PETTY,

              Plaintiff,

    v.

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA

              Defendant.

Case No.: 2:26-CV-03753

## COMPLAINT

COMES NOW Plaintiff, KRISTEN PETTY, by and through the undersigned attorney, for her Complaint against Defendant, THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, and alleges as follows:

## PARTIES

1. Plaintiff Kristen Petty ("Plaintiff" or "Petty") is the surviving spouse of Christopher Petty ("Decedent"). At all times relevant, both Petty and Decedent are and were residents of Maine. Petty is an employee of CACI International, Inc. ("CACI") and a participant in the CACI Life Insurance Plan No. 501 (the "Plan).

2. Defendant The Prudential Insurance Company of America ("Defendant" or "Prudential") is an insurance company who in accordance with the Plan issued Group Contract No. G-53145 (the "Policy") to CACI and a Certificate of Coverage (the "Certificate") to qualified

CACI employees and their dependent spouses (the Plan and the Policy are hereinafter collectively referred to as the "CACI Plan"). The CACI Plan is an employee welfare benefit plan within the meaning of ERISA of 1974, as amended, 29 U.S.C. § 1002(1). A copy of the CACI Plan is attached hereto as Exhibit A.

## JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 29 U.S.C. §1132(e) and 28 U.S.C. § 1331 because this Complaint arises under ERISA.

4. This Court has venue pursuant to 29 U.S.C. §1132(e) because Prudential may be found in this District and administered, reviewed and upheld a denial of Plaintiff's claim for CACI Plan benefits through its Beneficiary Services and appeals operation located in Philadelphia, Pennsylvania.

## FACTUAL ALLEGATIONS

5. The CACI Plan provides optional Accidental Death and Dismemberment ("AD&D") benefits to CACI employees and their qualified dependent spouses.

6. Under the terms of the CACI Plan, an employee can enroll her qualified dependent Spouse for optional AD&D benefits up to $250,000.

7. Decedent was Petty's spouse and was insured as a dependent spouse under the optional AD&D coverage in the amount of $250,000.

8. The CACI Plan pays AD&D benefits for "an accidental Loss which results from a Covered Accident."

9. "Covered Accident" includes an accident that happens to a qualified dependent for whom the employee is insured for Dependents Insurance and who is engaged in or the victim of a

covered Hazard which is defined as a "24 Hour All Risk Hazard" where "[t]he person is engaged in or the victim of a risk."

10. The CACI Plan defines "Injury" as injury to the body of a Covered Person.

11. The CACI Plan defines "Loss" to include a loss of life.

12. Benefits for accidental loss are payable if the person sustains an accidental bodily injury while a covered person, the Loss results directly from that injury and from no other cause, the loss occurs within 365 days after the covered accident, and the loss is due to a covered accident.

13. The CACI Plan contains an intoxication exclusion to which Prudential bears the burden of proof. The intoxication exclusion provides that "[a] Loss is not covered if it results from …. (10) Being under the Influence of alcohol or alcohol intoxication, including but not limited to having a blood alcohol level above the limit for permissible operation of a motor vehicle in the jurisdiction where the Loss occurred… ."

14. The CACI Plan provides that Prudential is the claims administrator who has discretionary authority to interpret the terms of the plan, make factual findings, and determine eligibility for benefits.

15. Prudential is financially responsible for paying the benefits under the CACI Plan. Prudential therefore operated under a structural conflict of interest.

16. The CACI Plan provides that the grant of discretionary authority does not apply to residents of Maine.

17. Petty and Decedent were residents of Maine.

18. Per the State of Maine Crash Report, on September 6, 2024, at approximately 10:30 p.m., Decedent was driving northbound on I-95 with a posted speed limit of 70 mph near mile marker one in Kittery, Maine when his vehicle failed to maintain control, went off the roadway to

the right, struck a breakdown guardrail, crossed over three lanes on the highway struck another vehicle in the far left lane, and then traveled off the road further north and struck another breakdown guardrail.

19. No alcoholic bottles or beverages were found in Decedent's vehicle.

20. EMS who arrived on the scene found Decedent pulseless with no signs of life.

21. EMS documented post-crash resuscitation efforts including continuous CPR/chest compressions and continuous suctioning of Decedent's airway with large amounts of coarse emesis of undigested food and the smell of alcohol type beverage.

22. Decedent was transported to Portsmouth Hospital where he was pronounced dead shortly after arrival at 11:24 p.m.

23. Medical records documented multiple facial fractures, multiple bilateral rib fractures with anterior flail segment, cerebral herniation, coma, and cardiac arrest.

24. The Medical Examiner conducted an external autopsy only and measured  Decedent's height as 5'7" and weight as 300 lbs. The Medical Examiner listed the cause of death as "Multiple blunt force impact injuries" and the manner of death as "Accident."

25. The Death Certificate likewise listed the cause of death as "Multiple Blunt Impact Injuries" and the manner of death as "Accident."

26. Postmortem femoral blood and vitreous fluid samples were collected during the external autopsy.

27. NMS Labs reported an ethanol result of 161 mg/dL and a BAC of 0.161 g/100 mL from postmortem femoral blood.

28. The Toxicology Report stated that "interpretation of reported findings should be based on the totality of available case information."

29. Petty timely submitted a claim for the Dependent Accidental Death benefit.

30. By letter dated December 30, 2024, Prudential denied the claim based on the intoxication exclusion relying primarily on the .161 NMS Labs toxicology results along with the Maine crash report and the death certificate notations of loss of failure to keep in proper lane and loss of control of a vehicle.

31. In its denial letter, Prudential concluded that Decedent suffered a loss related to a motor vehicle accident that was a result of driving under the influence.

32. Petty timely filed an administrative appeal dated June 30, 2025.

33. Petty's appeal included sworn affidavit statements concerning Decedent's daily alcohol consumption and tolerance, including that Decedent consumed approximately six to eight alcoholic drinks over a five-hour period, from 4:00 p.m. to 9:00 p.m., while attending a Red Sox game at Fenway Park with a friend on September 6, 2024. The affidavits further stated that, when the friend departed at approximately 9:00 p.m., Decedent had two bottles of hard seltzer remaining, and the friend observed Decedent to be acting normally and in control at that time.

34. Petty's appeal also included a forensic toxicology expert report from Dr. Stefan Rose, MD, who is a physician trained in forensic toxicology, clinical pathology and general psychiatry, with decades of experience in clinical pathology, forensic toxicology, epidemiology, and forensic laboratory analysis of antemortem and postmortem samples for alcohol and drugs.

35. Dr. Rose reviewed the crash report, EMS report, the death certificate, medical examiner's report, toxicology report, Prudential's denial letter and evidence presented by Petty concerning Decedent's alcohol tolerance and reported drinking and eating activity on the evening of September 6, 2024.

36. Dr. Rose opined that the EMS report's documentation of large amounts of emesis and the odor of an alcoholic-type beverage indicates that the Decedent had significant gastric contents containing ethanol. Dr. Rose further opined that, in the context of lethal traumatic injuries sustained in a high-speed crash, such gastric contents present a significant risk of contamination of postmortem femoral blood samples.

37. Dr. Rose opined that, in trauma cases, postmortem femoral blood may become contaminated with alcohol from surrounding organs and tissues due to the extreme forces involved in the collision, which can move alcohol from one area of the body to another during the trauma and during the postmortem interval before collection of the sample.

38. Dr. Rose opined that an internal postmortem examination should have been performed in this case to determine the nature and extent of the Decedent's injuries more fully, and to permit the collection of multiple blood samples from different anatomic locations for comparison and analysis.

39. Dr. Rose opined that comparison of multiple postmortem samples was necessary to determine whether the alcohol results were consistent across anatomic sites or whether discrepancies existed suggesting contamination, redistribution, or unreliable testing.

40. Dr. Rose further opined that the femoral blood sample was not identified as arterial or venous, which is significant because arterial blood alcohol concentrations may be up to forty percent higher than venous blood alcohol concentrations when alcoholic beverage remains in the stomach.

41. Dr. Rose opined that vitreous samples should have been collected from both eyes and compared with the postmortem blood samples to evaluate ethanol equivalency and assess the reliability of the reported blood alcohol result.

42. Dr. Rose performed Widmark calculations and determined that, given the Decedent's height of 5'7" and weight of approximately 300 pounds, the Decedent's blood alcohol concentration would not have exceeded approximately 0.03 g/dL even if he had consumed eight alcoholic drinks.

43. Dr. Rose further determined that, in order to reach the reported postmortem alcohol result of 0.161 g/dL, the Decedent would have had to consume approximately twenty alcoholic drinks, and there was no evidence supporting consumption of that quantity of alcohol.

44. Dr. Rose concluded that, if the Decedent consumed six alcoholic drinks, his calculated blood alcohol concentration at approximately 10:30 p.m., the time of the crash, would have been 0.00 g/dL using an ethanol elimination rate of 0.015 g/dL per hour.

45. Dr. Rose concluded that the postmortem samples collected in this case were flawed and inadequate for accurate and reliable alcohol testing.

46. Dr. Rose concluded that gastric contamination with ethanol was a significant concern in this case and was not ruled out as a source of ethanol in the postmortem remains.

47. Dr. Rose concluded that, due to the extreme trauma sustained by the Decedent and the physical effects of post-crash resuscitation efforts, postmortem contamination and redistribution of ethanol from the stomach and gastrointestinal tract was a certainty.

48. Dr. Rose concluded that the postmortem femoral blood sample and corresponding test results cannot be relied upon to determine the Decedent's actual blood alcohol concentration at the time of the crash.

49. Dr. Rose further concluded that, even assuming the femoral blood sample was properly collected, the postmortem blood alcohol test result does not, and cannot, establish Decedent's antemortem blood alcohol concentration at the time he was driving because of the extreme trauma involved in this case.

50. Because no internal examination was performed by the medical examiner, Dr. Rose found that contamination of the femoral blood sample with ethanol from gastric contents was likely and was not ruled out.

51. Dr. Rose explained that gastric contamination and postmortem redistribution are known mechanisms for false-positive or unreliable postmortem alcohol results in trauma cases.

52. Approximately six months after Petty timely filed her appeal, Prudential generated additional evidence in the form of an advisory report from Dr. Michael Lin, MD dated August 28, 2025 and provided it to Petty on November 6, 2025.

53. Dr. Lin is not identified as a forensic toxicologist expert or a forensic toxicologist.

54. Dr. Lin opined that the loss of life resulted from the Decedent being under the influence of alcohol or alcohol intoxication, relying principally on the reported postmortem BAC,

the legal driving limit, and generalized assumptions concerning alcohol impairment and the circumstances of the crash.

55. Dr. Lin did not perform a forensic toxicology analysis, did not calculate the Decedent's antemortem BAC, and did not determine whether the reported postmortem BAC of 0.161 g/dL reliably reflected the Decedent's BAC at the time of driving.

56. Instead, Dr. Lin acknowledged competing possibilities: that the Decedent's actual BAC at the time of driving could have been lower than the reported postmortem BAC due to gastric contamination or arterial sampling, or could have been higher or different due to continued alcohol absorption or metabolism before sampling. Despite acknowledging those unresolved issues, Dr. Lin concluded that it was "reasonable to assume" that alcohol had a direct effect on the accident that led to the Decedent's death.

57. Dr. Lin acknowledged Dr. Rose's opinion that ethanol-containing gastric contents can contaminate postmortem blood samples in traumatic injury cases, but dismissed that concern as speculative.

58. Dr. Lin also dismissed as speculative the issue of whether the femoral blood sample was arterial or venous, despite acknowledging that the sampling site could affect interpretation of the reported BAC.

59. Dr. Lin further discounted the sworn affidavit evidence submitted with Petty's appeal concerning the amount of alcohol consumed, including evidence that the Decedent consumed approximately six to eight alcoholic beverages.

60. Dr. Lin acknowledged that additional blood and vitreous sampling could have supported or refuted the reported 0.161 g/dL postmortem BAC.

61. Dr. Lin did not perform a Widmark calculation and did not refute Dr. Rose's calculation that approximately twenty alcoholic drinks would have been required for the Decedent to reach a BAC of 0.161 g/dL.

62. Dr. Lin did not identify evidence that the Decedent consumed approximately twenty alcoholic drinks.

63. Dr. Lin did not provide a forensic toxicology basis for treating the postmortem BAC as a reliable measure of the Decedent's BAC at the time of driving.

64. Prudential relied on Dr. Lin's report to support its denial of benefits, while failing to meaningfully address the portions of Dr. Lin's report that supported Petty's position or undermined the reliability of the postmortem BAC.

65. Per letter dated December 2, 2025, Petty responded to Dr. Lin's advisory report pointing out that it was speculative, not based on forensic toxicology, and insufficient to prove the alcohol exclusion. In the same letter, Petty further stated that Dr. Lin failed to address Dr. Rose's core analysis including Petty's height, weight, drinking timeline, alcohol quantity and Widmark calculations.

66. Per letter dated February 3, 2026, Prudential provided Petty with another Peer Review report from a different expert, Dr. Marvin Pietruszka, MD.

67. Dr. Pietruszka acknowledged that the death certificate identified the cause of death as multiple blunt impact injuries and the manner of death as accident.

68. In response to Prudential's question of whether in Dr. Pietruszka's medical opinion, the loss of life was a result of being under the influence of alcohol or alcohol intoxication, Dr. Pietruszka opined that Decedent was under the influence of alcohol at the time of the motor vehicle collision based on the postmortem 0.161 g/100 mL BAC and the presence of alcohol odor, and gastric contents with recent ingestion.

69. But Dr. Pietruszka in his medical opinion expressly stated that "the loss of life itself was not the result of alcohol intoxication as a direct physiological cause."

70. Dr. Pietruszka further stated that the proximate and direct cause of death was the severe traumatic injuries sustained in the collision.

71. Dr. Pietruszka did not opine that alcohol was the direct or proximate cause of Decedent's death; he stated that alcohol intoxication "may reasonably be considered a contributing factor to the occurrence of the accident."

72. Dr. Pietruszka acknowledged that postmortem redistribution, trauma-related disruption, prolonged resuscitation, and ethanol-containing gastric contents can affect BAC interpretation, and that the presence of gastric ethanol "introduces interpretive uncertainty."

73. Dr. Pietruszka admitted that the postmortem BAC could not determine Decedent's precise BAC at the exact time of driving with certainty.

74. Dr. Pietruszka further stated that the toxicology results should not be treated as an exact or definitive measurement of Christopher Petty's antemortem BAC at the time of the collision.

75. Dr. Pietruszka did not rebut or otherwise address Dr. Rose's Widmark calculations.

76. Dr. Pietruszka did not identify evidence that Decedent consumed approximately twenty drinks to reach 0.161 g/dL and that there was no evidence supporting that amount of consumption.

77. Dr. Pietruszka did not establish that Decedent's loss of life was a result of being under the influence of alcohol or alcohol intoxication, and instead identified severe traumatic injuries as the proximate and direct cause of death.

78. Prudential credited Dr. Pietruszka's report only as far as it supported the conclusion that alcohol contributed to the accident, while failing to meaningfully address the portions of the same report that undermined application of the alcohol exclusion.

79. Prudential failed to explain why it discounted Dr. Pietruszka's admissions supporting coverage, including his statements that the loss of life itself was not the result of alcohol intoxication as a direct physiological cause, that the proximate and direct cause of death was traumatic injury, and that the postmortem BAC was not an exact or definitive measurement of Decedent's BAC at the time of driving.

80. Plaintiff responded that Dr. Pietruszka's report undermined, rather than supported, Prudential's reliance on the alcohol exclusion.

81. By letter dated February 23, 2026, Prudential upheld its denial on appeal based on the alcohol exclusion.

82. Prudential relied primarily on the disputed postmortem BAC, generalized assumptions about alcohol-related impairment, and the fact that Decedent failed to maintain his lane.

83. Prudential credited its reviewers opinions  where they supported denial, but failed to meaningfully address the portions of those same reviews that undermined the reliability of the BAC evidence and the causal application of the alcohol exclusion.

84. Prudential's reviewers acknowledged that postmortem BAC interpretation may be affected by ethanol-containing gastric contents, traumatic injury, arterial-versus-venous sampling, postmortem redistribution, and prolonged resuscitation.

85. Prudential wrongfully and unreasonably failed to address Dr. Pietruszka's conclusion that although intoxication may reasonably be considered a contributing factor to the

occurrence of the accident, it was not the direct or proximate cause of the Loss (death) as required under the intoxication exclusion in the CACI Plan.

86. Prudential did not meaningfully address Dr. Rose's forensic toxicology analysis. Prudential also did not rebut Dr. Rose's calculation that Decedent would have needed to consume approximately twenty drinks to reach a BAC of 0.161 g/dL, where there was no record of Decedent consuming that amount of alcohol.

87. Prudential wrongfully and unreasonably relied on reviewers who did not resolve the forensic toxicology issues raised by Dr. Rose, including postmortem contamination, redistribution, sampling-site uncertainty, lack of corroborating vitreous testing, and the inconsistency between the reported BAC and the known drinking history.

88. Prudential wrongfully and unreasonably relied on reviewer opinions that inferred intoxication and causation from the disputed postmortem BAC, without establishing that Decedent's Loss resulted from being under the influence of alcohol or alcohol intoxication, as the exclusion requires.

89. Prudential treated uncertainty in the record as a basis to deny the claim, even though Prudential bore the burden of proving that the exclusion applied.

90. Prudential's selective reliance on favorable portions its reviewers reports, while failing to explain why it discounted material findings supporting coverage was wrong and unreasonable.

## COUNT I

### Recovery of Benefits Under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)

91. Plaintiff incorporates paragraphs 1-90 as if fully set forth herein.

92. Plaintiff has fulfilled all conditions for receipt of benefits under the CACI Plan and has presented such evidence to Prudential.

93. Prudential denied the claim by relying on the CACI Plan's alcohol related exclusion.

94. Prudential failed to establish that the exclusion applies because the administrative record does not show that Decedent's death resulted from intoxication or being under the influence of alcohol.

95. The administrative record shows that Decedent died from traumatic injuries sustained in a high speed motor vehicle collision.

96. Prudential's denial was wrongful and unreasonable.

97. Prudential's denial was contrary to the terms of the CACI Plan.

98. Plaintiff is entitled to benefits due under the CACI Plan pursuant to 29 U.S.C. § 1132(a)(1)(B).

99. Plaintiff has incurred, and will continue to incur attorneys' fees, costs, and expenses in bringing and prosecuting this action. Plaintiff is entitled to an award of such attorneys' fees, costs, and expenses pursuant to 29 U.S.C. § 1132(g).

WHEREFORE, Plaintiff Kristen Petty respectfully requests that this Court enter judgment in her favor and against Defendant Prudential as follows:

A. Award Plaintiff accidental death benefits due under the CACI Plan pursuant to 29 U.S.C. § 1132(a)(1)(B);

B. Award pre- and post-judgment interest as allowed under ERISA and the terms of the CACI Plan;

C. Pursuant to 29 U.S.C. § 1132(g), award payment of all costs and attorneys' fees incurred in pursuing this action; and

D. For such other and further relief as this Court deems just and proper.

DATED:  June 1, 2026                    MORGAN & MORGAN


By:     /s/ *Jo-Ellen Levy*
        Jo-Ellen Levy (#066785)
        MORGAN & MORGAN
        570 Crown Oak Centre Drive
        Longwood, FL 32750
        Tele: (215) 861-0498
        Fax: (215) 861-0523
        Email: joellenlevy@forthepeople.com

        *Attorney for the Plaintiff*